## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BONNIE FILER and**<br>**CATHRYN HIRSHON, individually and**<br>**on behalf of all others similarly situated,**<br><br>                             **Plaintiffs,**<br><br>   **vs.**<br><br>**BA CREDIT CARD FUNDING LLC;**<br>**BA CREDIT CARD TRUST; and THE**<br>**BANK OF NEW YORK MELLON, as**<br>**Trustee of BA Master Credit Card Trust II**<br><br><br>                             **Defendants.** | **JURY TRIAL DEMANDED**<br><br>Case No. |

## CLASS ACTION COMPLAINT

1.      Plaintiffs Bonnie Filer and Cathryn Hirshon, ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this consumer class action against Defendants BA Credit Card Funding, LLC; BA Credit Card Trust; and BA Master Credit Card Trust II, by and through its trustee, The Bank of New York Mellon, (collectively, "Defendants") to obtain statutory damages, compensatory damages, punitive damages, restitution, and declaratory and/or injunctive relief for themselves and on behalf of the Class defined herein.  Defendant The Bank of New York Mellon is solely named in its capacity as trustee for BA Master Credit Card Trust II.

2.      Defendants charge, collect, and receive usurious rates of interest from New York consumers, including Plaintiffs, in excess of New York's usury cap.  In so doing, Defendants have violated New York General Obligations Law § 5-501 and New York Banking Law § 14-a and also have been unjustly enriched as a result of their unlawful conduct.

1

3.      Plaintiffs assert the following allegations upon information and belief, except as to their own respective actions, the investigation of their counsel, and the facts that are a matter of public record.

## INTRODUCTION

4.      New York has forbidden the practice of usury for over 200 years.

5.      Since at least 1787, New York has prohibited lenders from charging excessive interest to debtors.[1]  This ancient and bedrock principle remains a part of New York consumer financial law.

6.      At all times relevant to this Complaint, New York has forbidden the collection of interest above 16% per annum.  N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a.  Persons and corporations are forbidden from "directly or indirectly, charg[ing], tak[ing] or receiv[ing]" interest above the usury limit.  Interest includes not just items labeled as "interest," but also certain fees.  *See* 3 N.Y.C.R.R. § 4.2(b).

7.      The State of New York has such a strong interest in protecting consumers from unreasonable interest charges that receiving interest at some levels is a felony.  New York Penal Law § 190.40 states that a "person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

8.      Here, Defendants receive principal and interest payments from Plaintiffs and Class members (as defined below) that are made pursuant to credit card loans.  Defendants have charged,

---

[1] *See* L 1787, Ch. 13 (barring taking of interest above 7%).

taken, and received interest from Plaintiffs and Class members at rates in excess of 16%, in violation of New York's longstanding civil usury limit.

9.    This class action suit seeks monetary damages, restitution, and injunctive relief to restore wrongfully obtained usurious interest payments and to prevent Defendants from charging, collecting, or receiving usurious interest in the future.

## PARTIES

10.    Plaintiff Bonnie Filer is a consumer and a citizen of the State of New York, residing in Hamburg, NY.

11.    Ms. Filer is a debtor on an unsecured credit card loan.  Ms. Filer's loan is branded the "Cash Rewards" loan.

12.    Ms. Filer is currently carrying a balance on the Cash Rewards loan on which she pays an interest rate of at least 25%.

13.    Plaintiff Cathryn Hirshon is a consumer and a citizen of the State of New York, residing in Schenectady, NY.

14.    Ms. Hirshon is a debtor on an unsecured credit card loan.  Ms. Hirshon's loan is branded the "Cash Rewards World Mastercard" loan.

15.    Ms. Hirshon is currently carrying a balance on the Cash Rewards World Mastercard loan on which she pays in interest rate of at least 20%.

16.    Plaintiffs send their payments to an entity described only as "Bank of America."

17.    On information and belief, Plaintiffs' payments are owned by, owed to, and are paid to, Defendant BA Credit Card Funding, LLC, Defendant BA Credit Card Trust, and/or Defendant BA Master Credit Card Trust II.

18.    Defendant BA Credit Card Funding, LLC ("Funding") is a Delaware Limited Liability Company.

19.     Defendant BA Credit Card Trust ("BACC Trust") is a Delaware Statutory Trust, of which Defendant Wilmington Trust Company Delaware is the Owner Trustee and Defendant Funding is the beneficiary.[2]  BA Master Credit Card Trust II ("Master") is a common law trust for which Defendant The Bank of New York Mellon is the Trustee.[3]

20.     Neither Funding, Master, nor BACC Trust is a bank.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and more than two-thirds of the putative class reside in states other than the states in which Defendants are citizens.   This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Declaratory relief is available under 28 U.S.C. §§ 2201 and 2202.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because Plaintiff Filer resides in this District and suffered injury as a result of Defendants' acts in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants do substantial business throughout this District, Defendants have intentionally availed themselves of the laws and markets of this District, and Defendants are subject to personal jurisdiction in this District.

---

[2] *See* Fourth Amended and Restated Trust Agreement, October 1, 2014, *available at* http://ccabs.bankofamerica.com/abs/pdf/Trust%20Agreement.pdf
 (Last visited: November 1, 2019)
[3] In 2007, the Bank of New York became The Bank of New York Mellon.

## FACTUAL BACKGROUND

23.     Defendants have violated New York law by charging, taking and receiving payments from Plaintiffs and other New York consumers at interest rates exceeding the state usury limit.

24.     Defendants acquire the usurious interest payments from Plaintiffs and the Class through a series of purchases involving a shell company as part of a process known as credit card securitization.

### *Credit Card Securitization Generally*

25.     Credit card securitization transactions begin with a financial institution (the securitization "sponsor") assembling a pool of receivables on credit card loans that it made or acquired.  The sponsor then sells the receivables as part of a multi-step transaction that ultimately results in the sponsor exchanging the receivables for cash.

26.     Specifically, the sponsor first selects receivables arising from specific accounts and sells the entire balance of these receivables, as well as the right to purchase future receivables generated by those accounts to a wholly-owned, special-purpose subsidiary of the sponsor (the "depositor"), that has no other assets or liabilities.  This first sale is made to isolate the receivables from the sponsor's assets and liabilities, making them "bankruptcy remote," in the sense that they cannot be clawed back into the sponsor's bankruptcy or FDIC receivership estate. Absent bankruptcy remoteness, investors in the securitization could not invest based solely on the quality of the receivables and the risks specific to them.  Instead, they would be exposed to the overall risks of the sponsor firm.

27.     Second, the depositor sells these receivables (and the right to purchase future receivables) to a passive single-purpose entity ("SPE"), usually a trust. The SPE must be a stand-alone, legally-independent entity and cannot be a subsidiary of the sponsor, in order to ensure that

5

it could not be consolidated in bankruptcy or FDIC receivership with the sponsor. The legal separation of the SPE from the sponsor and depositor is critical to ensure that investors in the securitization are able to invest solely in the quality of the receivables and the risks specific to them, rather than the overall risks of the sponsor and depositor.

28.    To raise the funds to pay the depositor for the initial receivables, the SPE issues certificated securities (essentially bonds) to the depositor.  The depositor sells them to investors through underwriting affiliates.  Because these securities issued by the SPE are collateralized by the receivables (assets) owned by the SPE, they are called "asset-backed securities" or "ABS." The depositor then uses the funds from the SPE's sale of ABS to investors in order to pay the sponsor for the initial receivables.[4]

29.    The securitization transaction includes not just the sale of outstanding receivables on the designated credit card accounts, but also the right to purchase any new receivables generated by the designated accounts. As cardholders' subsequent purchase activities generate more receivables on the account, the new receivables are purchased (ultimately) by the SPE from the sponsor through the depositor. The SPE uses the principal payments collected from cardholders on the initial receivables to acquire the new receivables from the sponsor. The interest payments and fees collected from the cardholders are used to pay the SPE's operating expenses and the interest payments due on the ABS.

30.    The SPE is designed to be a passive entity in order to enable ABS investors to invest solely in the risks of the receivables, not the general operating risks of a firm.  The credit card receivables the SPE owns must be managed, however, as it is necessary for cardholders to be sent

---

[4] Alternatively, the depositor may transfer the ABS to the sponsor, which will then sell them into the market through an underwriting affiliate or directly.  Either way, the ultimate effect is the same:  the sponsor has transformed a pool of credit card receivables into cash.

billing statements and for payments to be collected from them. Therefore, the SPE contracts with a servicing agent (the "servicer") to collect the payments from the cardholders on behalf of the SPE for the benefit of the ABS holders. The servicer is often the issuer or an affiliate thereof, but need not be. Because the SPE owns the receivables, collections of the receivables from cardholders by the servicer are not made for the benefit of the financial institution that issued the credit cards in the first instance even if the servicer is the issuer.

31.    The securitization transaction effectively separates the beneficial ownership of the receivables from the legal title to the receivables and from the management of the receivables:  the SPE holds the legal title to the receivables;[5] the passive ABS investors (holders of the ABS) are the beneficial owners of the receivables; and the servicer manages the receivables as the agent of the SPE.

### Defendants' Credit Card Securitization Process

32.    Funding, Master and BACC Trust are engaged in collecting, taking and receiving payments from Plaintiffs and Class members for debts incurred through credit card loans, often originated by non-parties affiliated with Bank of America Corporation.  A September 6, 2019 Prospectus for notes issued by Defendant BACC Trust, outlines the way credit card loan payments are obtained by Defendants.[6]  As shown in the diagram, non-party Bank of America, N.A., ("BANA") is the sponsor; Defendant Funding is the depositor, and Defendants Master and BACC Trust are SPE's that together issue ABS.

---

[5] If the SPE is a common law trust, then the trustee holds legal title.
[6] https://www.sec.gov/Archives/edgar/data/936988/000114036119016463/form424b5.htm (last visited: November 1, 2019) ("Prospectus").



33.    The securitization process begins with consumers opening credit card loan accounts.  After Plaintiffs and class members open credit card accounts, certain accounts are designated for securitization.

34.    In the case of accounts securitized by Defendants, accounts are often but not necessarily originated and marketed by affiliates or agents of non-party Bank of America Corporation.  Accounts securitized by Defendants can also include credit card accounts opened by Class members from other institutions, which may not themselves be banks.  These accounts were thereafter purchased by affiliates of Bank of America Corporation and the receivables sold to Defendants.

35.    Pursuant to a Receivables Purchase Agreement, all receivables generated in the designated accounts are sold to Defendant Funding.[7] For purposes of these transactions, the term "receivables" refers to all payments owed by credit card debtors such as Plaintiffs, including principal and interest payments, and payments for all fees, including late fees, over limit fees, and annual fees.

36.    As stated in the Prospectus filed with the Securities and Exchange Commission, the sale of the receivables includes "all monies due or to become due, all amounts received or receivable, all collections and all proceeds."  Prospectus at 135.

37.    Funding is solely a shell company that has no employees and engages in no activity other than the purchase and re-sale of debts.  Its only function is to purchase receivables from non-party BANA or other entities and, in turn, sell those receivables to Master.

---

[7] Second Amended and Restated Receivables Purchase Agreement, dated July 8, 2015, ("Receivables Purchase Agreement") available http://ccabs.bankofamerica.com/abs/pdf/Purchase.pdf (last visited: November 1, 2019).

38.     According to Defendants, the purchase of these receivables is a true and complete sale of the loan payments. As stated in a contract that governs Funding's role in securitization, Funding acquired all "right, title and interest in, to and under [the credit card receivables]." Receivables Purchase Agreement at Section 2.01(a).

39.     Funding and BANA further agreed that the loan payments constituted "an absolute sale." Receivables Purchase Agreement at Section 2.01(f).

40.     Under the terms of the contract with BANA, Funding is legally bound to purchase and receive the consumers' payments on the designated accounts, even if the debt or fee payment obligation has not yet been incurred. Receivables Purchase Agreement at Section 2.01(b).

41.     Master is a common law trust with The Bank of New York Mellon as its Trustee, and exists solely to purchase receivables from Funding, and to facilitate the issuance of asset backed securities collateralized by the payments from class members and other debtors.

42.     Master purchases the right to the credit card payments of Plaintiffs, class members, and other cardholders from Funding. Defendants view this transaction as a true and complete sale.

43.     The Amended and Restated Pooling and Servicing Agreement that governs Defendants' securitization activities stated that Funding "hereby transfers, assigns, sets over and otherwise conveys to Trustee [The Bank of New York Mellon] all of its right, title and interest, whether now owned or hereafter acquired, in, to and under" the credit card receivables.[8] Pooling and Servicing Agreement at Section 2.01.

44.     The Pooling and Servicing Agreement further contained the statement that Defendant The Bank of New York Mellon, as Trustee, "acknowledges its acceptance, on behalf of

---

[8] Fourth Amended and Restated Pooling and Servicing Agreement, dated December 17, 2015 ("Pooling and Servicing Agreement") available at http://ccabs.bankofamerica.com/abs/pdf/PSA.pdf (last visited: June 3, 2019).

the Trust, of all right, title and interest" to the credit card receivables. Pooling and Servicing Agreement at Section 2.02(a).

45.     To be particularly explicit, Defendants further stated in the Pooling and Servicing Agreement that the transfer of credit card receivables "constitute a sale, and not a secured borrowing, for accounting purposes." Pooling and Servicing Agreement at Section 2.01.

46.     Because Defendants purchase of the debt payment obligations are true sales of all "right title and interest" in the receivables, in the event that the originating entity, in this case likely non-party BANA, were placed in FDIC receivership, the payment obligations would not be the property of the receivership estate.

47.     BACC Trust is a Delaware Statutory Trust, with Funding as beneficiary, and Wilmington Trust Company as Owner Trustee. By the terms of its Trust Agreement, BACC Trust is to operate as a "Single Purpose Entity," with its sole purpose to engage in the purchase of receivables and to issue debt against the payments from Class members and other debtors.[9]

48.     To compensate Funding for the receivables, Defendant Master issued a collateral certificate to Funding, which then conveyed it to Defendant BACC Trust. As described in a recent filing with the Securities and Exchange Commission, the "collateral certificate represents an undivided interest in BA Master Credit Card Trust II." Prospectus at 1.

49.     As described in the flow chart above, the collateral certificate conveys the payments of Plaintiffs, class members and other card holders from Master to BACC Trust.

---

[9] Fourth Amended and Restated Trust Agreement, dated October 1, 2014 ("Trust Agreement"), available at http://ccabs.bankofamerica.com/abs/pdf/Trust%20Agreement.pdf (last visited: June 3, 2019).

50.     Having an "undivided interest" in the receivables on Plaintiffs' and the Class members' loans, Defendant BACC Trust sells securities to investors backed by these payment obligations as ABS.[10] The proceeds of these ABS sales, in turn, pay for the purchase of receivables from Funding.

51.     As with Master, BACC Trust is an entity that is "bankruptcy remote," ensuring that the title to class members' loan payments are not subject to recovery in the event that the originating entity were subject to bankruptcy or receivership proceedings.  Moreover, BACC Trust's Trust Agreement contains "nonpetition covenants," in which Defendants agreed not to "acquiesce, petition, or otherwise invoke" bankruptcy or insolvency proceedings.   Trust Agreement at Section 5.06.

52.     Because Master and BACC Trust are special purpose vehicles with no employees and the credit card receivables must be managed (*e.g.*, billing statements sent out to cardholders and payments collected from them), Master contracts with a servicer to collect the payments from the cardholders on behalf Master and BACC Trust for the benefit of ABS holders.

53.     Total System Services, Inc., performs account servicing functions for Defendants, including payment processing and reporting, statement rendering, card issuance, fulfillment operations and network services. Prospectus at 131-132.  Total System Services, Inc., is not a bank.

54.     Defendants pay the servicer a fee to collect on the payment obligations owned by the trusts.  As part of this fee, all expenses related to servicing the receivables are reimbursed to the servicer and borne by the trusts.  *See* Pooling and Servicing Agreement at Section 3.02.

---

[10] The sale is done indirectly and the mechanics of the sale are not material to this complaint.

55.    A receivable represents an outstanding balance for purposes of federal law.  Accordingly, neither Defendants nor the servicer on their behalf can increase the interest rate on receivables they own absent specified circumstances.  15 U.S.C. § 1666i-1.

56.    Defendants agreed by contract not to take actions that could "impair the value of any Receivable now existing or hereafter created."  Pooling and Servicing Agreement at 11.01(e).

57.    Federal law requires a securitizer to retain an economic interest in a portion of the credit risk it transfers through securitization.  15 U.S.C. §78-o-11(b)(1).  Defendant Funding complies with this requirement by retaining a "Transferor Interest" in Defendant Master. Prospectus at 59.

### *Securitization of Plaintiffs' Debt Payments*

58.    The list of specific accounts whose receivables have been sold is held by Defendants in secret and is ascertainable only from Defendants' nonpublic records.  The Pooling and Servicing Agreement specifically directs the Trustee not to disclose the account numbers or other information indicating which accounts' payments are payable to Defendants.  Pooling and Servicing Agreement at Section 2.02(b).

59.    Public information demonstrates, however, that accounts whose payment obligations have been purchased by Defendants include those of Class members paying interest at rates that exceed New York's usury limit.

60.    According to the Prospectus, consumer credit card receivables owned by Master had the following attributes as of July 1, 2019:

- 5.9% of the accounts in the securitization pool were from borrowers with a New York billing address (666,198 accounts);

- the average age of the accounts was approximately 231 months;

- the accounts had an average principal receivable balance of $2,768 and an average credit limit of $16,227;

13

- 41.5% of the accounts had a balance between $0.01 and $5,000; and

- 9% of the accounts had a balance between $5,000.01 and $10,000.

61.     Plaintiffs' loans are consistent with these characteristics and are, upon information and belief, among the loans whose payments have been purchased by Defendants Funding, BACC Trust, and Master.

62.     Through this securitization scheme, Defendants have engaged in a standard practice and policy of charging, collecting, receiving, and attempting to collect interest from Plaintiffs and Class members in excess of the permissible interest rate in New York.

### *Madden* and the *"Madden Fix"*

63.     In 2015, the Second Circuit considered a usury case brought by a cardholder against a debt collector that had acquired the cardholder's defaulted credit card loan. *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).  The plaintiff in *Madden*, a New York resident, alleged that the defendants violated the New York usury statute by charging and attempting to collect interest at a rate higher than that permitted by New York law.  The defendant debt collector argued that the National Bank Act ("NBA") preempted the claim alleging violation of the New York state usury rate because the debt collector purchased the plaintiff's credit card loan from a national bank that was entitled to charge an interest rate allowed by the laws of the state, territory, or district where the bank is located.[11]  *See Madden*, 786 F.3d at 250 (quoting 12 U.S.C. § 85).

64.     The Second Circuit rejected the defendant's argument in *Madden* and held that entities other than national banks are only entitled to NBA-preemption under the limited circumstance where application of state law to the underlying action would significantly interfere

---

[11] More specifically, the *Madden* defendants argued that "as assignees of a national bank, they too are allowed under the [National Bank Act] to charge interest at the rate permitted by the state where the assignor national bank is located—here, Delaware." *Id.* at 250.

with a national bank's ability to exercise its powers under the NBA. Specifically, the Second

Circuit noted that:

> state usury laws would not prevent consumer debt sales by national banks to third
> parties. Although it is possible that usury laws might decrease the amount a
> national bank could charge for its consumer debt in certain states (*i.e.*, those with
> firm usury limits, like New York), such an effect would not "significantly
> interfere" with the exercise of a national bank power.

*Id.* at 251.  The Supreme Court denied *certiorari*.

65.     The Second Circuit's decision in *Madden* thus made clear that non-banks cannot

charge usurious interest rates merely because they purchased or were assigned loans by national

banks.

66.     Following the *Madden* decision, the banking industry was indisputably on notice

that national banks could not sell or assign their ability to charge otherwise usurious interest rates

to non-national bank third parties.

67.     In fact, the industry conceded this fact when urging the Supreme Court to grant

*certiorari*.  The Structured Finance Industry Group, an entity that lobbies on behalf of entities

engaged in securitization, admitted in its *amicus* brief in favor of *certiorari* that *Madden* held that

the National Bank Act does not "preempt the application of state usury law to sales of bank loans

to non-banks[.]" Brief of the Structured Finance Industry Group, Inc., *et al.* as Amici Curiae in

Support of Petitioners, *Midland Funding, LLC v. Madden*, No. 15-610 (December 10, 2015) at 3.

68.     Industry *amici* urged that *Madden* be overturned, explicitly because "firms have

removed loans made to borrowers in the Second Circuit from asset-backed securitizations due to

usury concerns." Brief of the Clearing House Association, LLC, *et al.* as Amici Curiae Supporting

Petitioners, *Midland Funding, LLC v. Madden*, No. 15-610 (December 10, 2015) at 23.

Notwithstanding this industry understanding of the law, non-banks, including Defendants here, still collect and receive interest from New York consumers in violation of New York's usury limit.

69.     Indeed, although Funding, Master, and BACC are not banks, they continued to purchase usurious credit card receivables well after the *Madden* decision.

70.     Rather than bring securitization practices into compliance with the clear statement of law, the lending industry chose to lobby Congress unsuccessfully to change the law.

71.     The lending industry reported spending millions of dollars collectively on lobbying activity in 2017 and 2018, with specific references to two congressional bills informally known as "*Madden* Fix" legislation. Ultimately, neither the Financial CHOICE Act of 2017 (H.R. 10), nor the Protecting Consumers Access to Credit Act of 2017 (H.R. 3299, S. 1642) became law.

72.     Despite failing to change the law, Defendants have still not changed their unlawful and usurious practices.[12]

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs bring this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following individuals:

> All individuals residing in New York that have paid interest to Defendants directly or indirectly pursuant to a credit card loan at a rate above 16% at any time since November 5, 2013.

---

[12] A February 2019 article by analysts with Standard & Poors / S&P Global that discussed the *Madden* decision and Colorado's efforts to enforce its usury laws against non-bank entities observed that some recent securitization transactions "excluded those loans made to Colorado residents above the state's usury limits … or with collateral pools that excluded all loans made to Colorado residents."  *See* Chouhan *et al*., *Marketplace Lending and the True Lender Conundrum*, *available at* https://www.capitaliq.com/CIQDotNet/CreditResearch/RenderArticle.aspx?articleId=2171229&SctArtId=467289&from=CM&nsl_code=LIME&sourceObjectId=10887397&sourceRevId=1&fee_ind=N&exp_date=20290222-18:32:49 (last visited: May 30, 2019).  The clear implication is that lenders can readily exclude loans that violate state usury rates from their securitization pools if they choose to do so.

(Collectively referred to herein as the "Class.")

74.     Excluded from the Class are borrowers other than individuals, including but not limited to corporations, LLCs, non-profits and other organizations, and borrowers with credit card loan balances that exceed $250,000.00 or with credit card accounts deemed to be in default.  Also excluded from the Class are Defendants, their subsidiaries, affiliates; officers, directors, legal representatives, and employees; all persons who make a timely election to be excluded from the Class; governmental entities; and any judge to whom this case is assigned and his/her immediate family.  Plaintiffs reserve the right to revise the Class definition based on information learned through discovery.

75.     Class certification is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

76.     Numerosity—Fed. R. Civ. P. 23(a)(1).  The Class is comprised of thousands of individuals who are or were New York credit card account holders, the joinder of which in one action would be impracticable.  The exact number or identification of the Class members is presently unknown.  The identity of the Class members is ascertainable and can be determined based on Defendants' records, records of originator entities, or similar entities and/or public records.

77.     Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3).  The questions of law and fact common to the Class predominate over questions affecting only individual Class Members, and include, but are not limited to, the following:

(a)     Whether the Class Members were charged interest at rates above 16%;

(b)     Whether the Defendants received the Class Members' payments, directly or indirectly;

(c)      Whether, as a result of Defendants' conduct, Plaintiffs and the Class have suffered injury and, if so, the appropriate relief; and

(d)      Whether Plaintiffs and the Class are entitled to damages and/or punitive damages or other relief.

78.      Typicality—Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of those of the Class in that Plaintiffs, like all Class members, incurred debt and paid interest at rates above the applicable limit.  Plaintiffs have suffered damages in the form of additional interest costs, and such damages are consistent with those suffered by Class Members.

79.      Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1).    Plaintiffs are an adequate representative of the Class because they fit within the class definition and their interests do not conflict with the interests of the members of the Class she seeks to represent.  Plaintiffs are represented by experienced Class Counsel.  Class Counsel have litigated numerous class actions, and Plaintiffs' counsel intends to prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the members of the Class.

80.      Superiority—Fed. R. Civ. P. 23(b)(3).  The class action is the best available method for the efficient adjudication of this litigation, because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts.  Plaintiffs and the Class have suffered irreparable harm as a result of Defendants' conduct.  Because of the size of the individual Class members' claims, no Class member could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful and unfair conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law.  Further, individual litigation

has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

81.    Plaintiffs and the Class do not anticipate any difficulty in the management of this litigation.

**FIRST CAUSE OF ACTION**
**New York General Obligations Law § 5-501**
**(Asserted on Behalf of Plaintiffs and the Class)**

82.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and succeeding paragraphs of this Complaint as if fully set forth herein.

83.    Defendants have violated and continue to violate N.Y. Gen. Obl. Law §5-501 and N.Y. Bank. Law §14-a by charging, collecting, and receiving interest from Plaintiffs and the Class at a rate in excess of the 16% usury limit.

84.    Pursuant to N.Y. Gen. Obl. Law §§5-511 and 5-513, Plaintiffs and the Class are entitled to a declaration that Defendants cannot enforce the usurious contracts, and disgorgement of all sums paid in excess of the usury limit.

**SECOND CAUSE OF ACTION**
**Unjust Enrichment**
**(Asserted on Behalf of Plaintiffs and the Class)**

85.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and succeeding paragraphs of this Complaint as if fully set forth herein.

86.    As a result of Defendants' unlawful and deceptive actions described above, Defendants have been and continue to be unjustly enriched at the expense of Plaintiffs and the Class as a result of their payment of excessive and improper interest rates.

87.    Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that they have received from Plaintiffs and the Class.

88.     Defendants should be required to disgorge the monies they have unjustly obtained to the detriment of Plaintiffs and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for judgment against Defendants granting the following relief:

a.     An order certifying this case as a class action and appointing Plaintiffs' counsel to represent the Class and Plaintiffs as representatives of the Class;

b.     All recoverable compensatory and other damages sustained by Plaintiffs and the Class;

c.     Actual, treble, punitive, and/or statutory damages for injuries suffered by Plaintiffs and the Class in the maximum amount permitted by applicable law;

d.     An order requiring Defendants to immediately cease their wrongful conduct as set forth above;

e.     Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

f.     Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated:  November 5, 2019                          Respectfully submitted,

Charles J. LaDuca
C. William Frick
Christian Hudson
CUNEO, GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW
Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Fax: (202) 789-1813
Email: charlesl@cuneolaw.com
Email: bill@cuneolaw.com
Email: christian@cuneolaw.com

Shanon J. Carson
Glen L. Abramson
Patrick F. Madden
BERGER MONTAGUE P.C.
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604

Katherine G. Howard, Esq.
CONNORS LLP
1000 Liberty Building
Buffalo, New York 14202
Telephone: (716) 852-5533
Facsimile: (716) 852-5649
kgh@connorsllp.com